In accordance with Section 447.201 and 447.403 of the Florida Statutes and Florida Administrative Code Rule 60CC-3, Martin O. Holland was appointed as Special Magistrate on May 18, 2009 to hear the facts of the impasse described herein, then to offer his Recommended Decision pursuant to the authority granted to the Special Magistrate by the Florida Statutes. On May 22, 2009, the parties were advised of suggested hearing dates. The parties mutually agreed to the hearing date of June 22, 2009 during a pre-hearing conference call. The hearing commenced at 9 a.m. and continued to 6 p.m. A transcript was not made of the parties' arguments and submissions. The hearing was deemed closed at the exchanging and receiving of the parties post-hearing briefs. *Page 2 
 Objective
The objective of the Special Magistrate is to recommend a decision to the parties that would be acceptable in free collective bargaining, that meets the parties' realistic expectations and that the recommendations are justified under the Florida Statute criteria for such decisions. The Recommended Decision is a careful and conscientious balancing of various factors in public employment, the current economic climate and the reality of other public employment contracts with industrial norms and generally accepted labor practices. The goal is quick ratification by both parties pursuant to the statutory scheme.
 Background
Orange County Public Schools, Florida, (District or Board) serves in excess of 174,000 students (K-12 enrollment) in over 180 schools or worksites. Orange County has seen exceptional growth since Walt Disney World established Disneyworld as a world-renowned entertainment park. The District employs 12, 300 instructional personnel and the District's budget exceeds 1.4 billion dollars. The District has grown to the fourth largest in the Florida and eleventh largest in the United States. In 2008, the District saw a rare reduction in student enrollment. The District receives its funding from two main sources. Orange County property taxes known as the local effort (43%) and Florida State funding (43%) known as Florida Education Finance Program (FEFP) provides the basis for the District. Prior year surplus (6%) and rebudgets (7%) are also part of the total operating revenue sources. Federal funding, such as Title I, is about 1%. Other special funding for the District such as grants or sales tax collections is specifically reserved for capital projects. Of special significance, the District was awarded the coveted "A" school district award by the State in the 2007/2008 (07/08) school year. The *Page 3 
District highly complimented its employees for a job well done. The District has a longstanding collective bargaining relationship with the Orange County Classroom Teachers Association (OCCTA or Association). OCCTA represents approximately 6,000 teachers. The Collective Bargaining Agreement (CBA or contract) provides job security, wages and pay steps. The routine yearly step increases are for the first 24 years. In addition, the CBA provides for merit pay for such accomplishments as a Masters or Doctorate degree. The beginning salary for a teacher, in 2007, was $37,000.00 and after 24 years of step increases is $61,560.00 without other special pay provisions. Uniquely, step increases may be suspended in any given year based upon a formula in the Collective Bargaining Agreement. The CBA provides that the parties may agree to suspend step increases when anticipated revenue increases do not exceed double the cost of the step increase. The parties are then free to negotiate some other form of equitable compensation. The parties agreed the cost of the 07/08 step was $7.1 million. Accordingly, the anticipated revenue increase needs to exceed $14.2 million for the step increases to be automatic. In the 08/09 school year revenues were not anticipated to increase.
OCCTA entered into a ratified Collective Bargaining Agreement on October 11, 2007 for the "07/08" school year. Uniquely, each year thereafter, the parties agreed to reopen the wage clause. Negotiations started in April 2008 for salary increases for the school year 08/09. The State and County's economic condition suffered a severe downturn. By August of 2008, the parties agreed that sufficient funds were not available for the step increase or a general pay raise at that time. The negotiations were suspended in part to wait for the outcome of Florida's regular legislative session and the potential for a new *Page 4 
federal stimulus package. From September to March, the District received numerous updates from the State Regulator that as much as $240 million shortfall may be a reality in their planned operations budget. On November 11, 2008, the District, through its internal bulletin, announced: "The Collaborative Bargainingleadership will resume bargaining on salaries with a meeting inearly December. The team is waiting for results from the State,"
Nevertheless, in February 2009, the District offered a $500. "recognition award" to OCCTA bargaining unit members. The lump sum bonus was a substitute for step and wages in the 08/09 year. In March 2009, the District offer was withdrawn citing the continuing financial concerns and the bleakness of the national economy. Indeed, in March 2009 the nation's economy, stock market, bank closures, unemployment rate and residential foreclosures rate seemed overwhelming. As of this Recommended Decision, much of the March 2009 depression panic has been reduced to a serious financial recession and more stability has returned to the economy. The District received increased funding from the Florida legislature at session end on May 5, 2009 and over $60 million in new federal stimulus money. On May 21, 2009 in a letter to employees, the District Superintendent, Ronald D. Blocker, stated funding for next year will be "much closer towhat it was this year. " Mr. Blocker stated the shortfall was $43 million rather than the $240 million predicted. The District ended the 08/09 school year with a slightly higher than average surplus of 5.35% or 70 million dollars. The District maintained the State required 3% contingency fund reserve, and was able to maintain more than the 3% in its reserve fund which the State monitors. In total, the District maintained an overall surplus of approximately 8.35% of its operating revenue. *Page 5 
Meanwhile, the OCCTA waited to see the final outcome from the state and federal actions but continued significant issues on the bargaining table of both monetary and non-monetary terms. The OCCTA and the District incorporated a "Collaborative Bargaining" technique into the CBA. Together, they had meetings to discuss various issues and contract terms. The meetings were summarized and the written reports produced were accepted, with corrections as needed, at subsequent meetings. Generally, the senior members of the District labor team as well as OCCTA are present to discuss and then offer formal "tentative agreements" for the ratification process. The parties presented the magistrate with a booklet of CTA-CBLT (Classroom Teachers Association — Collaborative Bargaining Leadership Team) minutes for the Record from June 19, 2007 to impasse of April 22, 2009. The minutes of the CTA-CBLT Record specifically references ongoing issues of bargaining. In effect, the CTA-CBLT could amend the CBA at anytime by issuing a tentative agreement for ratification. It is clear the OCCTA maintained bargaining issues on the table up to invoking of impasse by the District at the April 22, 2009 meeting of the CTA-CBLT. According to the District, the sole issue is monetary. Specifically, the District refused to offer any wage or step package to OCCTA. The parties have not discussed any of the bargaining issues since impasse because the District invoked impasse. The CBA provides at Article II (I.2): "If impasse isdeclared, the parties shall meet to review any pending tentativeagreements unrelated to the impasse and to consider theirsubmission for ratification as outlined in Section 1 above priorto a special master (magistrate) hearing and prior to a publichearing. " The CBA language manifest an intent of the parties that bargaining may proceed after an impasse is declared. Neither the CBA nor the statute can support the District's argument *Page 6 
that the interest hearing is limited to monetary issues. The April 22, 2009 agenda for the CTA-CBLT shows many issues of economic and non-economic to be discussed. The April agenda shows the "step plus 2%", fringe benefits, medical benefits, directives and "upon request" as issues to discuss. The agenda used shorthand terms to reference areas of concern in the CBA. The District chose to declare impasse and then refused to discuss any other issue on the agenda. The CBA's Recognition Clause and Florida Statute impose a duty to bargain in good faith. I have personally witnessed impasse issues at other impasse hearings being negotiated and settled. The District's belief that impasse stops all bargaining is not supported by the spirit or language of the statute. The duty to bargain is encouraged throughout this process.
It is axiomatic; the OCCTA has every right to bring unresolved bargaining issues to the Special Magistrate under the Florida statute. The parties CBA specifically reference the authority of Chapter 447 of the Florida Statute in Article II, Negotiation Procedures. The Collaborative Bargaining in the CBA cannot usurp the Statute. Accordingly, the Special Magistrate will recommend a decision on all issues presented by the OCCTA.
 Discussion
A Special Magistrate is a neutral or arbitrator with broad labor experiences that the parties mutually select. The Special Magistrate is similar to a fact finder or judge pursuant to the Florida statute. The impasse procedure is governed by statute because teachers, as police/fire bargaining units, are prohibited from striking. Public employees and employers who bargain to impasse and then utilize the impasse procedure expect a *Page 7 
fair and reasonable outcome of their dispute. It has long been held, in the private sector, that arbitration between employers and unions brings "industrial peace" and is quid pro quo for a no strike provision in a collective bargaining agreement. TextileWorkers Union v. Lincoln Mills, 353 U.S. 443, 453-55 (1957) Most states have public employee bargaining statutes and many states have impasse procedures with binding impasse decisions or impasse decisions with special provisions. In Florida, the Recommended Decision is a public tool to test the reasonableness of the parties' impasse position. The value in the Magistrate's Recommended Decision is the scrutiny brought to bear on the parties' positions and the public pressure to accept a neutral's recommendation that results from the impartial evaluation and analysis of each party's position. The point is, a Special Magistrate's Recommended Decision must be afforded true deference by the parties and legislative body for the statutory scheme to work. In some States, as Illinois, teachers have the right to strike while such actions by police/fire are prohibited. The general public accepts that police/fire and teachers are fundamental to public service and those employees are valuable. It is often expressed that teachers control our nation's future and police/fire protect the future. Interest arbitration, throughout the majority of states, utilizes a standard or criteria that are essentially the same as the Florida Statute,"Factors to be considered by the Special Magistrate." See Section 447.405, Fla. Stat. One state with a long history of police/fire interest arbitrations is Michigan. The Michigan Supreme Court clarified similar standards found in the "Michigan Police and Firemen's Arbitration Act" stating:
"Since the Section 9 factors are not intrinsically weighted, they cannot of themselves provide the arbitrators with an answer. It is the [arbitrator] panel which must make the difficult decision of determining which particular factors are more important in resolving *Page 8 
a contested issue under the singular facts of a case, although, of course, all applicable factors must be considered." Detroit v.Police Officers Assn., 105 LRRM 3083, 3092
Similarly, Arbitrator James J. Sherman considered the Florida Statute for standards and comparison. Arbitrator Sherman stated that statutory standards in. his opinion ". . . are intended tohe applied only selectively depending upon the circumstances ofeach case `that the standards' are not to be given equal weightin every case . . ." and "Indeed in some cases particularstandards probably have no applicability and should not eveninfluence the decision." City of Winter Haven, 65 LA 557 (1975)
Accordingly, this Special Magistrate will consider and give weight to all of the five factors listed in Section 447.405
recognizing that some factors may deserve greater weight and discussion in this Recommended Decision. Further, the statutory language, "The factors, among others, to be given weight by the Special Master", is recognition that the Special Magistrate may also consider other well-founded principles of interest arbitration. The five express statutory factors in 447.405 are:
447.405 Factors to be considered by the special magistrate. —The special magistrate shall conduct the hearings and renderrecommended decisions with the objective of achieving a prompt,peaceful, and just settlement of disputes between the publicemployee organizations and the public employers. The factors,among others, to be given weight by the special magistrate inarriving at a recommended decision shall include:
 (1) Comparison of the annual income of employment of the publicemployees in question with the annual income of employmentmaintained for the same or similar work of employees exhibitinglike or similar skills under the same or similar workingconditions in the local operating area involved.
 (2) Comparison of the annual income of employment of the publicemployees in question with the annual income of employment ofpublic employees in similar public employee governmental bodiesof comparable size within the state.
 (3) The interest and welfare of the public. *Page 9 
 (4) Comparison of peculiarities of employment in regard toother trades or professions, specifically with respect to:
 (a) Hazards of employment. (e) Job training and skills.
 (b) Physical qualifications. (f) Retirement plans.
 (c) Educational qualifications. (g) Sick leave.
 (d) Intellectual qualifications. (h) Job security.
 (5) Availability of funds.
In interest arbitration situations, special magistrates are confronted with conflicting arguments raising divergent issues, which must ultimately be resolved. The application of generally applied arbitration principles used by magistrates to reconcile the conflicting issues and positions of the parties must be explained in some detail. Wage issues constitute the most common subject of interest arbitration. City of Willowick, Ohio,110 LA 1146 (Ruben, 1998) In City of Waterville, the city's discipline policies were submitted to an arbitrator to formulate.107 LA 1194 (Dichter, 1994) Here, the employees are teachers. Their passion and dedication are directly related to our futures. Their knowledge, skills and abilities include specialized training for the gifted as well as the impaired student. Teaching is a career choice with limited mobility once hired by a district. Teachers must achieve and maintain educational and intellectual qualifications far higher than the general public.
It has long been recognized that a district or city has a fiscal interest in maintaining the quality and morale of its teachers since the property values and local businesses find its economic worth is influenced by the quality of the school district. A superior school district will encourage commercial businesses, building and property values. Today, school districts are very much a concern of the general public as well as its students. *Page 10 
Citizens of Orange County have recently been exposed to several severe hurricanes and now an economic crisis. Importantly, the Orange District received its first "A" District rating by the State during this time. Credit must be given to the teachers. The cost of teaching the youth of Orange County is high but the services are essential to the general public and teachers forge the future.
I recognize that this dispute resolution is different in the public sector than in the private sector. The private sector is bilateral, employer and employee. Whereas the public sector is trilateral. The employee, governmental unit as the employer and the public as the taxpayer make the process different. While the profit motive is absent in public services, the taxpayers' vote is the ultimate decider of the level of public services. In Aboodv. Detroit Board of Education, the United States Supreme Court expressed:
The government officials making decisions as the public"employer" are less likely to act as a cohesive unit than aremanagers in private industry, in part because different levels ofpublic authority — department managers, budgetary officials, andlegislative bodies are involved, and in part because eachofficial may respond to a distinctive political constituency. Andthe ease of negotiating a final agreement with the union may beseverely limited by statutory restrictions, by the need for theapproval of a higher executive authority or a legislative body,or by the commitment of budgetary decisions of criticalimportance to others.
 . . . Finally, decisionmaking by a public employer is above all apolitical process. The officials who represent the publicemployer are ultimately responsible to the electorate,which . . . can be viewed as comprising three overlapping classesof voters — taxpayers —, users of particular governmentservices, and government employees. . . .
 . . . Public employees are not basically different from privateemployees; on the whole, they have the same sort of skills, thesame needs, and seek the same advantages. "The uniqueness ofpublic employment is not in the employees nor in the workperformed; the uniqueness is in the special character of theemployer." 431 U.S. 209, 228 (1977) *Page 11 
In State of Florida v. Florida Police Benevolent Association, the Florida Supreme Court noted public employees' bargaining is not the same as private bargaining. 613 So. 2d 415, 142 LRRM 2224
(Fla. 1993) The Court explained that while the private sector experience could serve as a reference, the private sector is not an infallible basis for public employment. Id. Notably the Court reasoned the public sector employees in Florida require legislative approval and discretion that cannot be bargained away. Id. @ 418 Nevertheless, the District and legislative body must recognize that the significant purpose of the Florida statute and its statutory scheme should not be discarded. A legislative body's easiest political choice may be to refuse any increased cost to the taxpayers, but workers expect and deserve a fair wage for quality work. The following finding of fact and Recommended Decision is a product of that statutory scheme.
A brief description of the methodology or general standard in interest arbitration practices used by this Special Magistrate can be explained. However, methodology may vary depending upon the type of issue to be decided and whether the proposal is by the Union or the Employer. Methodology is the balancing of relevant factors found in the Record of this proceeding in order to make a decision. The parties provided extensive documentation of comparable districts, revenue facts and projections. The Florida Statutes, 447.405, are more specific factors which are incorporated into this general standard. I can explain this methodology in three varying standards. The first standard is for wages or economic cost benefits that are often the heart of any interest dispute. Each item of cost should be ascertained and assigned a dollar amount. An employee may cost $50,000.00 in salary alone. Across the board raises are the easiest to measure. A simple *Page 12 
payroll cost for 100 employees at an average salary of $50,000.00 is $5 million. Thus, a 1% raise is $50,000.00. For the Orange County District, a 1% wage increase amounts to $5.2 million. A simple 1% increase in wages has definite costs but fringe benefits often increase the true cost of an employee to 140% of payroll. The impact of new State requirements for classroom size must be considered. Smaller classrooms will require more teachers. Public employment is associated with preferred fringe benefits including pensions and healthcare. Further, job security can be considered as a mitigating factor to high wages because shortages of work or layoff are seldom a factor for senior employees. Defined pension plans, as enjoyed by this bargaining unit, are preferred but they are being eliminated in private industry. However, the fact is, the tax base of Orange County can be expected to grow in the future if the last 35 years is any trend. Disney and the Orlando attractions are not going to move any time in the foreseeable future. The cost of living index in May 2009 in central Florida has grown by 1.3% despite the cost of oil products and a falling real estate value index. The price of a loaf of bread and other necessities has increased. A new CBA must be viewed based upon the whole cost associated with a new contract terms. If the employees are awarded a fair wage increase then other cost items such as step increases, or paid administrative leave must be viewed as additional pay increases that must be justified by reasonableness, fairness and/or industry practices. For economic consideration, the Magistrate will consider the employer's action in regards to its other employees, similar type employees within the geographic area, general wage trends and economic area indicators and the changing industrial practices for overall employee compensation. Without a doubt, the current real estate values in central Florida must be considered and the Magistrate realizes the *Page 13 
financial impact to the District. Next, the Magistrate will consider any need for catch-up wages if the employee group is disadvantaged in any particular economic status. The Magistrate notes the OCCTA employees received generous raises in 2004, 2005 and 2006. The District pays its employees favorably compared to the I-4 corridor districts. Finally, the Magistrate may consider total hours worked. It is noted here, that the majority of this bargaining unit works a 196-day work year. In the local area, OCCTA employees work the same State required work year and workweek hours.
The next standard is for OCCTA's proposals. OCCTA's rights proposals can be the most difficult. The Association is always the seeker of new or stronger rights for its members. The Special Magistrate must consider the historical bargaining relationship and the maturity of the relationship. Often disputes may arise because of new operational needs, an unforeseen circumstance or a rare experience that recently developed. A CBA is a living document and can be changed depending upon the need and circumstances of the parties. However, not every dispute between the parties needs to be addressed in a CBA and special magistrates are reluctant to change any existing language. Clearly, the Association's proposals are measured by their effect upon the security and safety of its members. An employee may be overburdened by regulatory rules that are redundant or wasteful. A magistrate may recommend a proposal when a strong connection to the members' security and safety in the workplace is made. The stronger the merits of such proposal the stronger the possibility it may be recommended. Factors such as industry practices and comparative CBAs may be considered as evidence for change. Still, those factors must be balanced against the cost to the employer and its effectiveness to manage *Page 14 
its workforce. Forty years ago, the U.S. autoworkers may have been the strongest bargaining group in our country. The autoworkers could seek modifications to procedures and methods of the auto assembly line but never could the autoworker dictate the number of automobiles to produce. It is axiomatic that management has all reserved rights except those expressly given away by a CBA. Indeed, many management decisions for hiring, work product and methods are central to management rights. If however, the assembly line is too fast, too dangerous, or too strenuous, the union has a meaningful voice and a right to seek contract terms for the workers' security and safety. Here, the Association's right is a sliding scale. The Association also has proper authority to seek contractual terms that secure the members security and dignity. The Association may show an unwarranted burden upon its members. The Association may show management abuses and not merely an example of possible harm. The greater management's unwarranted burden the greater the need for more contractual security for its association members. Worker security and safety must be documented to a point where the merits of the Association's proposal diminish management's unilateral right to govern. No arbitrator can enunciate a bright line test, but an experienced arbitrator will see it when presented.
Thirdly, management may propose a new contract term, modify an existing term, or seek a deletion of an existing term. Here, the District did not seek any CBA modifications but a discussion of its implications is useful. Management proposals have a slightly different standard. When management proposes a new or modified contractual term it must show and document what harm or effectiveness the proposal is meant to correct or accomplish. *Page 15 
Management may seek a new contract term to make certain the workforce is aware a specific behavior is expected. Management proposals must be balanced against the workers' existing rights for security, safety and dignity. Management must express and prove more than an inconvenience or mere dispute of terms. Management may document economic waste. Management may show excessive cost figures or multiple complaints or grievances that cause an abuse of the work environment. Nevertheless, even management's inconvenience or dispute should not lead to a modified contractual term unless a clear persuasive showing is made for the modification. Generally, management's reserved rights give broad discretion to manage its workforce. If management had previously agreed to some contractual terms then the proof of an abuse or cost must be exceptionally clear and strong. It is assumed the parties have previously exchanged consideration for the existing contract term. Consideration means one or both of the parties gave up something of a monetary value or right to secure a contract term. Interest arbitrators dislike change for the sake of change. When a special magistrate considers a proposal to change existing language, the burden of proof or justification is high. Magistrates should leave contested language changes to the parties for future negotiation unless the totality of circumstances justifies the need for immediate modification. Even then, the magistrate must estimate the value of the modified or deleted contract term and realize other benefits may have been exchanged to secure the prior existing term. The Recommended Decision that follows has considered not only each factor in the Florida Statute but the general standards I outlined above. The Recommended Decision is not designed to make any one party satisfied, but it is *Page 16 
designed to leave the parties in a position where reasonable bargainers, given the totality of the circumstances, can complete the terms of the CBA.
 Recommended Decision
Appendix A, 08/09
The Special Magistrate recommends no change in existing languagebut the District should pay a performance recognition award of a$500.00 lump sum payment to each eligible bargaining unitemployee.
OCCTA sought a wage increase of 2% as well as the normal step increase. The combined cost would be in excess of $18 million. While the District does have the reserve funds of $70 million at the end of the 08/09 school year, the District still faces much uncertainty. I understand the bargaining for the 09/10 school year will start immediately after this Decision and the teachers deserve a general wage increase and the normal step increase.
The $500 lump sum payment is justified as a performance recognition to the District employees because of the dedication and hard work in achieving the State's "A District" status. The District has the ability to pay the estimated cost of $11 million. I cite Dr. Barbara Jenkins, Chief of Staff and Dr. Richard Collins, Chief Financial Officer, presentations in the February 3, 2009 CTA-CBLT minutes. It appears the District's original $500. proposal was justified by the fact the cost of $11 million was about half of *Page 17 
the "total dollars in the fund balance account".[1] A lump sum payment is a non-recurring expense for the 08/09 school year, which is now over. The District's final fund balance in May 2009 is greater than what was expected in February 2009. I find the District should reaffirm its original offer because the economy has improved, more federal stimulus is coming, and the reserve funds are sufficient.
It was noted the Board altered its school start times for various schools resulting in the reverse of an $8 million cost savings and the Board chose not to increase its millage by .025 despite its ability to do so. It appears these were operational decisions by the Board, which they have a right to make. The Recommended Decision here seeks fairness based upon the reality of the District's ability to pay.
Article XVI — Salary (existing language)
The Special Magistrate recommends no change in this section.
The OCCTA sought to modify existing language to make a stronger guarantee that steps will be given each year. I agree the normal practice of step increases are a continuing obligation of the employer. Here, the steps are over the first 24 years of employment. The same practice of steps are found in many school districts, police and fire collective bargaining agreements. Step increases are normally automatic and are not considered wage increases. The OCCTA's CBA is rather unique because step increases may be suspended by agreement. The CBA in 08/09 required the suspension of the step *Page 18 
increases. It was an economically depressed year. The parties agreed to temporarily suspend the steps because the anticipated revenues were not sufficient to support the step increases. The alternative for the District would have been layoffs. In fact, the District did layoff 800 personnel leading up to the 08/09 year. Many were rehired but the District did avoid midyear layoffs. I cannot say that the OCCTA proposals to guarantee step increases are warranted or justified at this time. The issue needs a two party agreement
Article XVI — Salary (New Language)
The Special Magistrate recommends and adopts the Association's #3Proposal.
Add to Article XVI N No newly hired employees will be moved aheadof existing employees if the salary schedule is frozen.
The Association proposes that new hires do not make more money then veteran teachers for the same number of years of service. New hires from other districts to this district will be employed at the step they carryover from their prior employment. Since this District suspended a step increase in the 08/09 year, a five-year teacher from Dade may be hired at a greater salary than a five-year teacher at Orange County District. This is unfair and the District acknowledged the unfairness. However, because the District declared impasse, the District would not negotiate any changes. As I view the CBA and statute, the District should have addressed this concern. Accordingly, I accept the Association's proposal in total. *Page 19 
Article IV — Association Rights
The Special Magistrate recommends the deletion of "85 days" inthis article and replacing with "105 days".
The Association sought an increase in paid leave based upon a specific percentage of the bargaining unit membership. The Association did address this issue at several CBLT meetings. The Association argues the bargaining unit has almost doubled since the 85-day limit was negotiated into the CBA in 1993. Clearly, a collaborative style relationship recognizes the Association is a real partnership benefit to the District. State funding is always a mutual issue. Employee inquiries are substantial. In reality, the Association saves the District management time and resources. I accept the Association's need for an increase in leave per fiscal year. I understand the District has argued the OCCTA has not even used 85 days in the past years, but that only indicates the OCCTA's good intent.
Article VI — Working Conditions.
The Special Magistrate recommends the Association's proposal todelete the words "upon request" in Article VI.
The Union seeks to delete the words "upon request" from the existing language. The Association's proposal makes sense. The District claims this was not on the table at impasse, but the District chose to declare impasse and refused to bargain any further. However, the agenda of April 22, 2009 clearly shows "upon request" was on the table. *Page 20 
Article XIV — Duty Day
The Special Magistrate recommends the following language:
"Middle and senior high school teachers shall not be required toteach more than two subject areas, providing further, thoseteachers will be limited to four (4) preparations unless theteacher waives such a restriction with a copy to theAssociation."
The Association proposal for three (3) preparations and a Glossary Definition may have merit but I cannot accept such a change without more compelling evidence. I note this issue was brought to the CTA-CBLT and was deferred. The CTA-CBLT is free to readdress this issue.
Glossary (existing language, Directive)
The Special Magistrate recommends no change in existing language.
The Association makes a good argument but without evidence of harm. The issue of "Directive" was discussed at various meetings with the CTA-CBLT. In any event, a directive is not discipline. A directive should never be used by a supervisor once there is compliance. I presume a directive is a statement from a supervisor to a subordinate that certain actions are expected. No more than a principal directing the teacher to apply a technique in a certain course. If directives were used for discipline or indications of an employee's worth, I would agree with the Associations' concerns. Shelf life of a directive should be limited to the specific objective sought. A directive should be only *Page 21 
maintained at the worksite where the notation was made, because it is a specific and limited document designed to assist the teachers. The CTA-CBLT is free to readdress this issue.
 Conclusion
I have balanced the District's ability to pay, the public interest and other factors with the Association's interest for this Recommended Decision. City of Philadelphia, 79 LA 372
(DiLauro, 1982); City of Burlington, Iowa, 68 LA 454 (Witney, 1977). The Florida Statute criteria in 447.405 has also been considered.
[1] The Record is not clear why the $500. lump sum cost $11 million. If the District has 12,300 employees, the cost would be $6.15 million.